IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 0:21-cv-60841-AHS

MJ CAPITAL FUNDING, LLC,

     Plaintiff,

v.

LESLY REYNOLD FLEURIMOND,

     Defendant.

_____

**PLAINTIFF'S MOTION FOR DEFAULT
FINAL JUDGMENT AGAINST DEKTOR CORPORATION**

Plaintiff MJ Capital Funding, LLC ("Plaintiff"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 55(b)(2), hereby move for entry of a Default Final Judgment against defendant Lesly Reynold Fleurimond ("Defendant"), and states as follows:

**PROCEDURAL SUPPORT FOR DEFAULT FINAL JUDGMENT**

1.     On April 19, 2021, Plaintiff filed its original Complaint in this action against a "John Doe" defendant.   The original Complaint contains four causes of action: (1) Violation of the Anti-Cybersquatting Consumer Protection Act (ACPA) and (2) Defamation/Business Disparagement.

2.     Following discovery tailored to identify the "John Doe" defendant, on May 28, 2021, Plaintiff filed its First Amended Complaint.  [D.E. 10].   The only substantive change between the original and First Amended Complaint is the substitution of Defendant for "John Doe" – the claims/factual allegations between the two pleadings remain the same.

3.    On June 27, 2021 (following service of the Complaint on Defendant), Plaintiff filed its Motion for Clerk's Default [D.E. 17] against Defendant.  The Clerk entered a default against Defendant on June 29, 2021 [D.E. 18].

4.    On July 8, 2021, the Court entered its Order on Default Judgment Procedure [D.E. 19].

## FACTUAL SUPPORT FOR DEFAULT FINAL JUDGMENT

I.    **Plaintiff's Business**

1.    Plaintiff engages in the business of providing merchant cash advances to businesses located in Florida and throughout the United States.  Generally stated, Plaintiff provides funds to small business owners in exchange for a percentage of the business' income over a specified period of time.  The total amount to be repaid is calculated by a factor rate, a multiplier generally based on a business' financial status.

2.    Plaintiff was created as a Florida limited liability company on June 10, 2020.

3.    On July 29, 2020, Plaintiff registered the domain www.mjcapitalfunds.com and thereafter has utilized an interactive website at such domain to conduct a substantial amount of business.

4.    Plaintiff's website provides background information on how Plaintiff can assist small businesses with merchant cash advances and further invites business owners to fill out an online application for funding (in addition to providing other contact methods).

5.    Plaintiff's website (together with its other marketing material) prominently displays Plaintiff's logo/service mark:



6.      Since its inception, Plaintiff has rapidly developed a loyal customer following in addition to relationships with several key funding partners (who provide investment monies that are then used to provide the subject merchant cash advances).

**II.      "mjcapitalfundss.com"**

7.      On April 10, 2021, Defendant registered the domain www.mjcapitalfundss.com (substantially identical to Plaintiff's website with an additional "s" at the end).

8.      Following that date, Defendant published a website on the domain that, on its initial splash page, purports to suggest that Plaintiff is operating a Ponzi scheme through its merchant cash advance business.[1]

9.      Defendant's website purports to provide an "investigation into MJ Capital Funding," concluding (without a scintilla of evidence in support) that Plaintiff is operating a "massive" Ponzi scheme and directing consumers to not invest or do business with Plaintiff.

10.      Defendant's website goes on to call Plaintiff's merchant cash advance business a "scam" and further states that "my [Defendant] team and I are putting together a group of defrauded investors to file a lawsuit which will then trigger a criminal investigation."

11.      The website contains an "About" page which purports to provide information about the author – "Johnathan Aaronson" who represents himself as a "private citizen journalist who exposes fraudulent business operations."

---

[1]      True and correct copies of the various sub-pages of Defendant's website are attached to the First Amended Complaint as Exhibit A.

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

12.      "Johnathan Aaronson" is a fake name (corresponding to a fake driver's license that was provided to Plaintiff via e-mail) utilized by Defendant to accomplish an extortion scheme (which, upon information and belief, Plaintiff is not the first victim of).

### III.    Defendant's Attempted Extortion

13.      On or about April 11, 2021, Defendant's website was brought to Plaintiff's attention through communications with a prospective merchant/customer account.

14.      Upon learning of the website, Plaintiff (through Johanna M. Garcia, one of Plaintiff's members) on April 11, 2021 submitted a contact form on the www.mjcapitalfundss.com website which notified the owner thereof that he/she was infringing on Plaintiff's name and disparaging/defaming Plaintiff with the content.  The message further demanded that Defendant take down its website.

15.      On April 13, 2021, Defendant (using the alias "Johnathan Aaronso" – a misspelling of Defendant's other alias "Johnathan Aaronson") responded via e-mail to Ms. Garcia by using the e-mail address info@mjcapitalfundss.com.

16.      Defendant responded that all of the allegations on the www.mjcapitalfundss.com website are the truth and that the content of the website is "constitutionally protected 1st amendment exercise."

17.      In subsequent e-mails exchanged between the parties, however, the notion that Defendant is somehow a crusader for justice or a "journalist" was exposed as a sham.

18.      Indeed, when questioned about what (if anything) Defendant was seeking to remove the website, Defendant quickly responded by demanding payment of "$150,000 for the url" with the main 'deal' points being that Defendant would transfer the domain to Plaintiff and sign a non-disclosure/confidentiality agreement "that will prohibit me from even mentioning your

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

company online or offline for 15 years."

19.     For a supposed citizen journalist interested only in exposing purported scams, Defendant jumped at the opportunity to offer his silence in exchange for payment of a ransom.

20.     Defendant initially demanded payment via a "crypto wallet" to keep his/her identity a secret.

21.     Ultimately, however, Defendant's greed outshone his caution and Defendant provided a method of payment via www.squareup.com (a digital payment company) and later provided a routing/bank account number to accept payment of his/her ransom.

22.     Notably, Defendant sent provided an invoice through www.squareup.com in which his/her account is identified as being "TLT Solutions Inc" and routing/bank account information for an account at JPMorgan Chase that is identified as being "Dall Web Services."

23.     The routing/bank account information provided by Defendant was actually for "Dale Web Services LLC," a Florida limited liability company for which Defendant is the sole member.

24.     Defendant provided the JPMorgan Chase routing/account information on April 19, 2021 – the *same* day that he opened the JPMorgan Chase account (as Defendant was apparently eager to receive his ransom).

25.     Although Defendant temporarily disabled the subject website while the parties discussed payment of Defendant's ransom, he subsequently reinstated the website when he realized his ransom was not being paid.  Currently, Defendant appears to have again taken down the website, though Plaintiff expects he may again reinstate the website in the near future.

<u>**ARGUMENT**</u>

## I.      **Applicable Legal Standards**

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

Federal Rule of Civil Procedure 55 sets forth two steps to obtain a default judgment.  First, when a defendant fails to plead or otherwise defend a lawsuit, the clerk of court may enter a clerk's default.  Fed. R. Civ. P. 55(a).  Second, after entry of the clerk's default, the Court may enter default judgment against the defendant so long as the defendant is not an infant or incompetent.  Fed. R. Civ. P. 55(b)(2).  "The effect of a default judgment is that the defendant admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by entry by the judgment, and is barred from contesting on appeal the facts thus established."  Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987).

The Court must review the sufficiency of the complaint before determining if a moving party is entitled to default judgment.  See U.S. v. Kahn, 164 F. App'x 855, 858 (11th Cir. 2006) (citing Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206) (5th Cir. 1975); Tyco Fire & Sec., LLC v. Alcocer, 218 F. App'x 860, 863 (11th Cir. 2007).  "While a complaint . . . does not need detailed factual allegations," a plaintiff's obligation to show its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  If the admitted facts are enough to establish liability, the Court must then ascertain the appropriate amount of damages and enter final judgment in that amount.  See Nishimatsu, 515 F.2d at 1206.  An evidentiary hearing on damages is not required by Rule 55, and it is within the Court's discretion to choose whether to hold such a hearing. See Fed. R. Civ. P. 55(b)(2); SEC v. Smyth, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005); Tara Productions, Inc. v. Hollywood Gadgets, Inc., 449 F. App'x 908, 911-12 (11th Cir. 2011).

## II.     Plaintiff is Entitled to Judgment on its Claims

### A.     *Violation of the ACPA*

"To state a cybersquatting claim under the ACPA, 15 U.S.C. § 1125(d), Plaintiff must plead four elements: (1) Defendants have registered, trafficked in or used a domain name; (2) which is identical or confusingly similar to a mark owned by Plaintiff; (3) the mark was distinctive at the time of Defendants' registration of the domain name; and (4) Defendants committed the acts with a bad faith intent to profit from Plaintiff's mark.  Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC, No. 20-CIV-61255-RAR, 2020 U.S. Dist. LEXIS 196699, at *7-8 (S.D. Fla. Oct. 20, 2020) (citing Freedom Mentor, LLC v. Saeger, No. 618CV1235ORL40DCI, 2019 U.S. Dist. LEXIS 11217, 2019 WL 313788, at *5 (M.D. Fla. Jan. 24, 2019)).

Here, Plaintiff is entitled to final judgment against Defendant on its ACPA claim. Defendant registered, trafficked in, or used a domain name (www.mjcapitalfundss.com) that is identical or confusing similar to a mark owned by Plaintiff (www.mjcapitalfunds.com).  Plaintiff's mark was certainly distinctive at the time of Defendant's registration and there is likewise no question that Defendant committed his acts with a bad faith intent to profit from Plaintiff's mark. Indeed, Defendant specifically demanded payment of $150,000.00 from Plaintiff to "purchase" the subject domain for purposes of removing Defendant's defamatory statements thereon.

## B. *Defamation/Business Disparagement*

Under Florida law, the elements of defamation are: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008)).

Here, the evidence shows that Defendant published numerous false and defamatory statements about Plaintiff and Plaintiff's services to the www.mjcapitalfundss.com website which

was publicly viewable. As set forth in the attached Declaration of Johanna Garcia, multiple consumers and prospective consumers of Plaintiff's services did view Defendant's defamatory statements and refrained from doing business with Plaintiff as a result. Defendant knew or should have known that the defamatory statements were false when made and Plaintiff has suffered damages, including but not limited to lost sales and lost goodwill as a direct result of the defamation.

### III.    Damages

Plaintiff's damages are, admittedly, difficult to calculate. Plaintiff first learned of Defendant's website (www.mjcapitalfundss.com) shortly after Defendant's registration and publication thereof. The website accuses Plaintiff of operating a massive "Ponzi" scheme, warns consumers/prospective investors to refrain from doing business with Plaintiff, warns that a "criminal investigation" exists with respect to Plaintiff's sales practices, and falsely presents Defendant as a "private citizen journalist" (in an attempt to lend credibility to Defendant's lies).

As set forth in the attached Declaration of Johanna Garcia, Plaintiff (prior to ever filing this lawsuit) suffered at least $15,000.00 of damages directly traceable to Defendant's conduct. Upon learning of the www.mjcapitalfundss.com website, Plaintiff was forced to retain a third-party IT professional with software engineering experience to track/identify Defendant and attempt to mitigate the effect of his website. Plaintiff paid such third-party IT consultant **$15,000.00** to perform the following services, all of which were specifically in response to the publication of the www.mjcapitalfundss.com website:

- Search Engine Optimization (SEO) specifically tailored to 'bury' or lower Defendant's website in search results for consumers searching for "MJ Capital Funds" (as Defendant had implemented SEO that presented his website above Plaintiff's own site).

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

- Specific content creation that was published on Plaintiff's website to respond to Defendant's false allegations and inform consumers regarding Plaintiff's position thereon.

- An IT security audit on Plaintiff's internal network as certain of the allegations on Defendant's website suggested that he had access to Plaintiff's internal operations/was associated with Plaintiff in some manner.

In addition to the above, Defendant's conduct in publishing the subject website essentially caused Plaintiff's business to grind to an immediate halt while Plaintiff reacted thereto. Plaintiff was forced to remove several key employees from their business obligations and dedicate such employees essentially full-time to investigating Defendant's actions, fielding calls from both existing and prospective investors threatening to pull their funding, and participating in the drafting of multiple blog posts/website sub-pages to respond to Defendant's allegations. These employees included Johanna Garcia (Plaintiff's principal), Elizabeth Gomez (Plaintiff's head of human resources), Daniel Adams (Plaintiff's Chief Marketing Officer), Marco Rosas (one of Plaintiff's directors), Christian Cuestas (one of Plaintiff's directors), and Pavel Ruiz (one of Plaintiff's directors). Based on time and meeting records, Plaintiff estimates that the foregoing individuals collectively dedicated approximately 150 hours between April 12, 2021 and May 30, 2021 specifically to responding to Defendant's website allegations. Although Plaintiff reasonably believes this time resulted in the loss of hundreds of thousands of dollars in revenue, Plaintiff cannot with any degree of certainty support that belief. As a result, Plaintiff believes the best measure of damage here is the blended hourly rate for the aforementioned individuals ($125.00/hour) multiplied by the number of hours lost as a result of Defendant's activities (135), which equals **$18,750.00**.

Perhaps most directly, Plaintiff lost both existing investors and prospective investors

*directly* as a result of Defendant's false website statements.  As stated above, a key component of Plaintiff's business is Plaintiff's relationship with its funding partners.  Generally stated, these funding partners provide monies that are used by Plaintiff to fund merchant capital loans to Plaintiff's customers.  Plaintiff funds millions of dollars in merchant capital loans on a monthly basis, with the amount of such funding having steadily increased every month since Plaintiff's inception in 2020.   Many of Plaintiff's funding partners (the identity of which are proprietary/confidential as Plaintiff competes with various other merchant capital loan providers that similarly use funding partners) have funded multiple loans and indeed increased their funding amounts over their relationship with Plaintiff.

Plaintiff's business continued to increase/grow through January 2021, February 2021, and March 2021.  Through the first half of April 2021, Plaintiff's business continued in a similar fashion.  Following publication of Defendant's website, Plaintiff began receiving dozens (and ultimately hundreds) of telephone calls from multiple existing funding partners.  The bulk of these individuals demanded an immediate refund of their monies (most of which was already committed on one or more merchant loans) and/or demanded an explanation with respect to the allegations set forth on Defendant's website.  Johanna Garcia ultimately had to dedicate her full time to discussions with existing funding partners in an effort to convince them that Defendant's allegations were false and that Defendant was simply looking for a payout.  Through her efforts, Ms. Garcia was able to convince most of Plaintiff's funding partners to wait on their demands for a refund and to see what occurred in this lawsuit, but certain partners were not convinced and Plaintiff was forced to return **$495,000.00** to funding partners pursuant to exit agreements caused solely by Defendant's allegations.  Plaintiff suffered an extreme loss of goodwill in the process. Indeed, beginning in the second half of April 2021 and continuing through today, Plaintiff has seen

a sharp shrink in new funding from its existing funding partners.  Plaintiff has estimated a loss of approximately **$50,000.00** per month in repeat funding from existing funding partners for each of May 2021, June 2021, and July 2021 (and these lessened amounts are only the result of Plaintiff springing into action in retaining the aforementioned IT professional to counter Defendant's allegations).  Plaintiff estimates a loss of funding in April 2021 of approximately **$175,000.00** based on confirmation from these existing funding partners that they were not investing new monies given Defendant's allegations.  All of these losses are directly traced to the defamatory statements made by Defendant.

The damage caused to Plaintiff from the loss of prospective funding partners is, unfortunately, impossible to determine.  Plaintiff's representatives spoke to at least three dozen prospective investors who expressed grave concern regarding whether Plaintiff was running a Ponzi scheme and subsequently declined to do business with Plaintiff.  Approximately half of these prospective investors confirmed the reason for such was the possibility of losing money in a Ponzi scheme, while the remaining half declined to offer any reason for not partnering with Plaintiff.  Based on average investments made by its funding partners, Plaintiff estimates that this loss of prospective business would amount to at least $1,200,000.00 - $1,500,000.00 of net profit to Plaintiff (which factors in interest to be paid to Plaintiff on its merchant capital loans).  Plaintiff, however, cannot definitely confirm these investment amounts and therefore does not include them in its request for award of damages.

Finally, there is no question that Plaintiff has suffered a tremendous loss of goodwill caused by Defendant's extortionate/irresponsible efforts.  Being referred to repeatedly as running a "Ponzi scheme" by a purported citizen journalist who was purportedly aware of a "criminal investigation" into Plaintiff has caused a sharp decline in Plaintiff's business and has forced Plaintiff to explain

itself to countless persons inquiring about such.  Plaintiff cannot quantify this loss of goodwill. Plaintiff defers to the Court in establishing an amount of compensatory and *punitive* damages that fairly compensate Plaintiff for what is frankly shocking conduct.  Defendant attempted to capitalize on Plaintiff's name by pretending to be something he is not, spreading lies about Plaintiff, and then attempting to extort Plaintiff out of $150,000.00 to take down such lies. Defendant has not appeared in this action notwithstanding these serious allegations against him. Absent a serious consequence for his actions, Defendant is likely to repeat his actions again and again with respect to other unsuspecting business entities.  Plaintiff asks that the Court multiply any compensatory damages award by 2x – 3x as part of a punitive damages award.

**IV.    Statutory Damages**

Alternatively, to the extent the Court is not inclined to agree with Plaintiff's discussion of actual damages above, Plaintiff requests that the Court award statutory damages under 15 U.S.C. § 1125(d) in the full amount of $100,000.00 as a result of Defendant's egregious conduct herein (especially in light of the fact that Defendant demanded $150,000.00 for the subject website).

**V.    Permanent Injunction**

Given Defendant's conduct (which undoubtedly has caused irreparable harm), the Court should permanently enjoin Defendant from re-publishing the subject website and from publishing any other website (or otherwise making any publicly-available communication/statement) containing substantially the same content as the www.mjcapitalfundss.com site.  Specifically, Defendant should be enjoined from making any statement, blog post, website, etc. suggesting that Plaintiff is running a Ponzi scheme or otherwise defrauding its customers/funding partners. Permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

equitable remedy; and (4) an issuance of an injunction is in the public's interest.  ABS-CBN Corp. v. ABS-CBN Teleserye.com, No. 17-61051-CIV, 2017 U.S. Dist. LEXIS 222926, at *4 (S.D. Fla. Dec. 27, 2017).  Injunctive relief is available even in the default judgment setting.  Id.

Plaintiff has satisfied each of these factors.  First, Plaintiff has suffered irreparable harm. Quantifying the full extent of harm caused by Defendant is difficult if not impossible.  Plaintiff has suffered a tremendous loss of goodwill and reputation as a result of Defendant's lies.  Second, Plaintiff has no adequate remedy at law if Defendant is permitted to continue using Plaintiff's "MJ Capital Funding" mark/name because Defendant is diluting the value thereof.  If Defendant is allowed to re-publish the offending website/statements, Plaintiff will suffer even further loss as a result thereof.  Third, the balance of hardships favors Plaintiff because an injunction would simply prevent Defendant from further defaming Plaintiff, whereas Plaintiff would face a risk of further dilution of its name, loss of goodwill, etc.  Fourth, the public interest supports the issuance of a permanent injunction against Defendant because it will prevent consumer confusion and prevent the further commission of tortious conduct by Defendant.

## VI.    Transfer of Domain Name

Plaintiff also requests a transfer of the infringing domain name (www.mjcapitalfundss.com).  Broad equity powers allow the Court to fashion injunctive relief necessary to stop Defendant's infringing activities.  See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for . . . [t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould [sic] each decree to the necessities of the particular case." (alterations added; citation and internal quotation marks omitted)); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 724 (1944) ("Equity has

power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole." (citations omitted)).  District courts are expressly authorized to order the transfer or surrender of domain names in an *in rem* action against a domain name.  <u>See</u> 15 U.S.C. §§ 1125(d)(1)(C), (d)(2). However, courts have not limited the remedy to that context. <u>See, e.g.</u>, <u>Philip Morris USA, Inc. v. Otamedia Ltd.</u>, 331 F. Supp. 2d 228, 230 n.2 (S.D.N.Y. 2004) (transferring Yesmoke.com domain name to plaintiff despite the fact the plaintiff did not own a trademark in the term "Yesmoke" and noting 15 U.S.C. section 1125 "neither states nor implies that an *in rem* action against the domain name constitutes the exclusive remedy for a plaintiff aggrieved by trademark violations in cyberspace"); <u>Ford Motor Co. v. Cross</u>, 441 F. Supp. 2d 837, 853 (E.D. Mich. 2006) (ordering the defendants to disclose all other domain registrations held by them and to transfer registration of a particular domain name to plaintiff in part under authority of 15 U.S.C. section 1116(a)).

Because Defendant capitalized on Plaintiff's reputation and good will by using a confusingly similar domain name, it is appropriate to fashion injunctive relief that will eliminate the means by which Defendant is engaging in infringing behavior. Accordingly, the Court should order the transfer of the domain name www.mjcapitalfundss.com to Plaintiff.

**VII.    Entitlement to Attorneys' Fees**

Plaintiff seeks an award of attorneys' fees under the Lanham Act, 15 U.S.C. § 1117(a).  The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  The Eleventh Circuit has held that "to be an 'exceptional case' under the Lanham Act requires only that a case 'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated." <u>Tobinick v. Novella</u>, 884 F.3d 1110, 1118 (11th Cir. 2018) (quoting <u>Octane Fitness,</u>

LLC v. ICON Health and Fitness, 572 U.S. 545, 554 (2014)). This standard is more liberal than the Eleventh Circuit's previous standard for attorney's fees, "which required that a case be 'malicious, fraudulent, deliberate, and willful' in order to warrant attorneys' fees.'" Sream, Inc. v. Onive Food Inc., No. 18-80491-CV, 2018 U.S. Dist. LEXIS 238756, at *3 (S.D. Fla. Sept. 27, 2018) (quoting Burger King Corp. v. Pilgrim's Pride Corp., 15 F.3d 166, 168 (11th Cir. 1994)). "The district court has the discretion to determine whether a case stands out from others based on the totality of the circumstances." Domond v. PeopleNetwork APS, 750 F. App'x 844, 847 (11th Cir. 2018).

Plaintiff's well-pleaded allegations that Defendant willfully adopted a mark/domain name nearly identical to Plaintiff's own mark/domain name are enough to warrant attorney's fees under the Lanham Act in this case. See Sream, 2018 U.S. Dist. LEXIS 238756, 2018 WL 8345099, at *3; BayCare Health Sys., Inc. v. BayCare Health Mgmt. Corp., No. 8:18-CV-2380-T-60JSS, 2020 U.S. Dist. LEXIS 15475,, at *7 (M.D. Fla. Jan. 3, 2020); see also Choice Hotels Int'l, Inc. v. S & V Enterprises of Gainesville, Inc., No. 1:17CV177-MW/GRJ, 2018 U.S. Dist. LEXIS 229599, at *5 (N.D. Fla. Mar. 29, 2018) ("This Court notes the evolution of this circuit's 'exceptional case' standard simply to show that this case meets both standards due to the Defendants' nonparticipation, their default, and their willful infringement."). Here, Defendant not only violated the ACPA, placed highly defamatory material on the subject domain and, to add insult to injury, demanded $150,000.00 from Plaintiff as attempted extortion. The Court should exercise its discretion in awarding fees under the ACPA (subject to a further motion setting forth undersigned counsel's reasonable fees). Plaintiff is also entitled to recover costs under Section 1117(a) and FED. R. CIV. P. 54(d) (subject to the filing of the same post-judgment motion).

## CONCLUSION

DESOUZA LAW, P.A.
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (954) 603-1340

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting this Motion for Default Final Judgment against Defendant.  Plaintiff seeks final judgment in favor of Plaintiff consistent with the discussion herein (whether actual or statutory damages) and entry of a permanent injunction in connection therewith.

Dated: July 29, 2021.

DESOUZA LAW, P.A.
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone:  (954) 603-1340
DDesouza@desouzalaw.com

By: /s/ Daniel DeSouza, Esq._____
       Daniel DeSouza, Esq.
       Florida Bar No.:  19291

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using the Florida E-Filing Portal.  I further certify that on July 29, 2021, I served the foregoing document via US Mail to Lesly Reynold Fleurimond, 125 NW 13th Street, Suite B-8, Boca Raton, FL 33432 and via e-mail to lesf1889@gmail.com.[2]

DESOUZA LAW, P.A.

By: /s/ Daniel DeSouza, Esq._____
       Daniel DeSouza, Esq.

4820-2145-5458, v. 1

---

[2]      On June 21, 2021, Defendant contacted undersigned counsel from the lesf1889@gmail.com e-mail address with respect to this lawsuit.